ERNEST GALVAN – 196065
KARA J. JANSSEN – 274762
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
Email:    egalvan@rbgg.com
    kjanssen@rbgg.com

JAEHYUN OH*
NY Bar No. 5668512
THE JACOB D. FUCHSBERG LAW FIRM, LLP
3 Park Avenue, 37th Floor
New York, New York 10016
Telephone:    (212) 869-3500, Ext. 245
Email:    J.Oh@Fuchsberg.com

*Pro hac vice application to be submitted forthwith

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| S.F.V., an individual,<br><br>                Plaintiff,<br><br>        v.<br><br>UNITED STATES OF AMERICA, Estate of NICHOLAS THEODORE RAMOS, an individual, and JOHN/JANE DOES 1 through 10,<br><br>                Defendants. | Case No. 4:24-cv-04233<br><br>**COMPLAINT**<br>**DEMAND FOR JURY TRIAL** |

[4527071.2]

[Case No. 4:24-cv-04233]

Plaintiff S.F.V., by and through her attorneys, The Jacob D. Fuchsberg Law Firm, LLP and Rosen Bien Galvan & Grunfeld LLP, for her Complaint against Defendants as above captioned, allege as follows upon information and belief:

**INTRODUCTION**

1.      Nicholas T. Ramos (hereinafter "Defendant Ramos" or "Ramos"), a former Correctional Officer of the Federal Correctional Institute, Dublin (hereinafter "FCI Dublin"), exploited his position and power to stalk, sexually harass, assault, and sexually abuse numerous individuals who were incarcerated at FCI Dublin in the custody of the United States Bureau of Prisons (hereinafter "BOP") while he was employed there. In recent years, FCI Dublin, a federal female low-security prison with an adjacent satellite camp, has become the center of legislative inquiries, criminal investigations, and public attention with respect to the issue of staff sexual abuse in BOP custody. To date, eight correctional officers of FCI Dublin including a Chaplain and the Warden were criminally charged for having preyed upon vulnerable prisoners.[1]

2.      While incarcerated at FCI Dublin from 2017 through 2021, Plaintiff S.F.V. was sexually harassed, abused, and assaulted by Defendant Ramos on repeat occasions while he was acting within the course and scope of his employment. Plaintiff suffered her sexual abuse in silence, lest she was retaliated against or deprived of the modest privileges she had as an incarcerated individual. Defendant Ramos exercised complete dominion and power over the Plaintiff as a Correctional Officer, with the acquiescence of other BOP officers who were acting within the course and scope of their employment.

3.      Defendant Ramos's abuse only came to an end when he left FCI Dublin amid criminal investigation. In March 2022, Ramos was put on administrative leave after news stories broke that Ramos asked if he could be a "sugar daddy" for another incarcerated woman at FCI Dublin, A.R. A.R. said she did not accept his offer knowing

---

[1] *See, e.g.*, S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 1 (Dec. 13, 2022), https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf

[4527071.2]                                          1                              [Case No. 4:24-cv-04233]

that she would have to repay him with sex and that she could be isolated in the Special Housing Unit (hereinafter "SHU") as punishment. Despite her refusal, Ramos allegedly continued to harass A.R., including slamming a door into her. She reported the harassment to his superiors, including former Warden Ray J. Garcia, but no action was taken. Additionally, three women stepped forward, reporting that they were also harassed by Ramos, with one of them reporting that he watched her in the shower and she had filed a formal claim against the BOP. In or around August 2022, Ramos upon information and belief committed suicide, forcibly concluding the criminal investigation against him. Nonetheless, numerous women have alleged that Ramos used FCI Dublin as his playground where he could terrorize powerless women for years with impunity. There was at least one prisoner who reported Ramos's sexual misconduct to other BOP officers, including Stephen Putnam, then-Special Investigative Services (hereinafter "SIS") Lieutenant at FCI Dublin—only to be met with swift retaliation by Ramos.

4.    Defendant Ramos's recurrent sexual abuse of incarcerated persons was obvious to various agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, associate wardens, investigators, and warden at FCI Dublin during relevant times.

5.    Prior to and during Defendant Ramos's predatory conduct, Ray Garcia (hereinafter "Garcia"), a known sexual abuser himself, served a supervisory role to the correctional officers at FCI Dublin including Ramos. First as an Associate Warden from around December 2018 through around November 2020, and then as the Warden from around November 2020 to his removal in July 2021, Garcia created and maintained a pervasive culture of sexual misconduct and retaliation at FCI Dublin. In or around August 2022, Garcia himself was criminally charged with sexually abusing three prisoners at FCI Dublin and making false statements to a government agency during criminal investigation. The investigation also revealed that Garcia had ordered women to strip naked for him in their prison cells while he performed rounds. On December 8, 2022, a jury convicted Garcia of all charged counts. At the sentencing hearing held on March 22, 2023, Garcia

COMPLAINT
DEMAND FOR JURY TRIAL

admitted to having had sexual contacts with persons in his custody to gratify his sexual desires, while in the performance of his official duties as an employee of BOP and Warden of FCI Dublin. Garcia was sentenced to 70 months in prison, followed by 15 years' supervised release.

6.      During his sentencing, Garcia, as well as the Judge and the U.S. Attorney on the case, remarked on how Garcia's actions not only injured his direct victims but also set the tone for the rest of FCI Dublin. Seven individuals who worked under Garcia have now been charged with sexual abuse of incarcerated people. *See United States v. Highhouse*, No. 4:22-cr-00016-HSG (N.D. Cal.) (sentenced to 84 months in prison following guilty plea); *United States v. Klinger*, No. 4:22-cr-00031-YGR (N.D. Cal.) (sentenced to time served and home confinement following guilty plea); *United States v. Bellhouse*, No. 4:22-cr-00066-YGR (N.D. Cal.) (sentenced to 63 months in prison following jury trial where he was found guilty on all counts); *United States v. Chavez*, No. 4:22-cr-00104-YGR (N.D. Cal.) (sentenced to 20 months in prison following guilty plea); *United States v. Ramos*, No. 4:23-cr-00110-YGR (indicted on 12 counts); *United States v. Jones*, No. 4:23-cr-00212-YGR (N.D. Cal.) (sentenced to 96 months in prison following guilty plea); *United States v. Nunley*, No. 4:23-cr-00213-YGR (N.D. Cal.) (sentenced to 72 months in prison following guilty plea). Other than these known perpetrators, there are at least 14 additional BOP employees or contractors who have been placed under investigation for sexual misconduct that occurred at FCI Dublin. Under Garcia's leadership, FCI Dublin became a cesspool of sexual abuse. Defendant Ramos took advantage of this culture of abuse, while the other BOP personnel deliberately ignored alarming warning signs and allegations of sexual abuse that were prevalent throughout the prison.

7.      It was apparent to Plaintiff and other victims incarcerated at FCI Dublin that BOP personnel would not intervene to prevent Defendant Ramos's sexual assaults, let alone adequately discipline, supervise, or reprimand him in accordance with BOP's purported zero-tolerance policy against suspected staff sex abuse on prisoners. Upon information and belief, as early as the beginning of 2018, BOP employees were aware that

Ramos was spending time alone with female prisoners and engaging in sexually inappropriate conduct. This highly abnormal behavior continued unchecked throughout Ramos's tenure at FCI Dublin, which continued until 2022.

8.    Throughout his tenure, Defendant Ramos often spent time with female prisoners in off-camera areas for no ostensible reason. For example, he frequently entered women's prison cells to spend time with them, contrary to the existing protocols where prisoners were expected to leave the cell once officers entered it for a legitimate purpose (e.g., inspection). He would also stand watch in the showers so that he could see women's naked bodies as he pleased. He would also make abrasive, degrading, and sexually explicit remarks to women regardless of whether other officers could hear him. Since Ramos' arrival at FCI Dublin in or around the Fall of 2017, other BOP personnel allowed such conduct to continue for years until A.R.'s story broke in 2022.

9.    Over time, together with his friend and confidante Officer Sergio Saucedo, Defendant Ramos assumed the responsibility of monitoring security cameras throughout FCI Dublin so that they could control the comings-and-goings of their victims; and also, so that their sexually abusive behavior went undetected. Ramos often interacted with incarcerated persons in blind spots and stayed there for lengthy periods of time for no apparent reason. There was no intervention to correct this. Ramos made comments to his victims about how he was not worried about the security cameras as they do not work—exemplifying his reliance on institutional power and knowledge to sexually abuse women. Ramos would also bring contraband into FCI Dublin and use them as part of his *modus operandi* in sexual abuse. There was no intervention to correct this.

10.    Defendant Ramos frequently flaunted his close connections to the BOP administrators including Warden Garcia and SIS Lieutenant Putnam, telling his victims that he would not be fired even if his sexual misconduct was reported. Given his ability to sexually abuse numerous victims without intervention, Ramos's victims feared that he indeed enjoyed total impunity at FCI Dublin.

11.    Suspicions and allegations of Defendant Ramos's sexual abuse abounded at

FCI Dublin at least by 2019, as many BOP employees saw, knew of, and disregarded Ramos's suspicious interactions with incarcerated persons, some of which amounted to flagrant violations of FCI Dublin's security or operating protocols. Nevertheless, Ramos retained his position as a Correctional Officer at FCI Dublin, a female facility, for another three years. With the willful ignorance and tacit approval of his colleagues and superiors, Ramos continued his predatory reign on FCI Dublin, leaving countless victims in his wake including the Plaintiff.

12.    It was only through the deliberate indifference, recklessness, carelessness, gross negligence, and negligence of other BOP personnel, as well as abject systemic failures at FCI Dublin and BOP, that Defendant Ramos's sexual abuse could continue until 2022. BOP personnel's reckless disregard of the safety and welfare of victims including Plaintiff is highlighted by the fact that multiple correctional officers including Warden Garcia were sexually assaulting women incarcerated at FCI Dublin throughout the relevant times, resulting in its well-deserved reputation as the "rape club." Defendant Ramos fed into, and was also encouraged and enabled by, this toxic culture of FCI Dublin.

13.    As a result, Plaintiff S.F.V. was forced to engage in recurrent sexual encounters with Defendant Ramos by threats of force or coercion.

14.    Defendant Ramos sexually assaulted, abused, and harassed S.F.V. from approximately January 2018 through November 2021. After her arrival at FCI Dublin in or around November 2017, S.F.V. noticed increasingly frequent interactions initiated by Ramos, which became overtly sexual in nature in 2018 when she started working in the yard where Ramos was working. Ramos engaged in sexually explicit conversations with her anytime he was close enough to speak with her. Ramos's behavior escalated further in or around 2020 when he forcibly rubbed his erect penis against her buttocks over her clothes from behind, in a masturbatory fashion. This happened twice in 2020, and Ramos laughed at S.F.V.'s obvious discomfort and mortification. In mid-2021, a few months before S.F.V.'s release from FCI Dublin, Ramos sexually assaulted S.F.V. a third time by again rubbing his erect penis against her back and buttocks. In addition to these three

primary incidents, Ramos continued to stalk, harass, assault, and sexually abuse S.F.V. and to proposition her to have sex with him, including at least one occasion when he attempted to grope her breast. Throughout most of her time at FCI Dublin, Ramos was S.F.V.'s supervisor at work, which gave him constant opportunities to manipulate, accost, and torture S.F.V. verbally, physically, and emotionally. Ramos continued to torment S.F.V. until her transfer out of FCI Dublin in or around November 2021. After being released from BOP custody altogether in or around October 2022, S.F.V. reported the sexual abuse she suffered at Ramos's hand to the U.S. Attorney's Office.

15. S.F.V. felt that she had no choice but to comply with Defendant Ramos's sexual abuse. S.F.V. knew that Ramos held power over her placement, discipline, privileges, and well-being. Ramos used his institutional power to manipulate his victims into silence, threatening that they would get in trouble or be placed in the Special Housing Unit (hereinafter "SHU") if they tried to report him. Ramos also had Officer Saucedo torment his victims including S.F.V. to keep his power and control over them. S.F.V. suffered constant humiliation, bullying, and harassment by officer Saucedo, including making fun of her sexuality, her race, and her immigration status. S.F.V. continues to suffer the debilitating emotional consequences of Ramos and Saucedo's abuse to the present day.

16. Plaintiff S.F.V. experienced catastrophic and unnecessary pain and suffering because of Defendants' egregious disregard for, and carelessness towards, Plaintiff's safety and well-being despite myriad warning signs regarding Defendant Ramos's abhorrent conduct.

17. Plaintiff brings this suit pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and its progeny, for violations of her rights under the Fifth and Eighth Amendments to the United States Constitution by cruel and unusual treatment inflicted upon her by Defendant Ramos. Plaintiff further brings this suit under the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. §§ 2671, *et seq.*, in connection with the deficient supervision and custodial care provided

to her by various BOP personnel including Ramos, within the scope of their employment with the BOP. Plaintiff also brings claims based upon California state law on gender violence and sexual assault.

18.   Plaintiff seeks redress for Defendants' unlawful conduct, which caused her to suffer permanent and catastrophic injuries.

## JURISDICTION AND VENUE

19.   This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1346(b) as arising under the Constitution, laws, and/or treaties of the United States of America. Plaintiff's claims are predicated, in part, upon the FTCA, 28 U.S.C. §§ 2671, *et seq.*, authorizing actions seeking relief against the United States. Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a) with respect to any state law claims, as they are related to and form part of the same case or controversy as claims based on the federal Constitution, laws, and/or treaties.

20.   This Court has personal jurisdiction over the Defendants because the alleged incidents occurred within the confines of the State of California.

21.   Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and 1402(b) as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the boundaries of this District, in the County of Alameda.

## CONDITIONS PRECEDENT TO THIS LAWSUIT

22.   Plaintiff has properly complied with the requirements of 28 U.S.C. § 2675 by presenting an Administrative Claim against the United States of America (*i.e.*, Claim No. TRT-WXR-2023-02066). The Claim was timely filed with the BOP on January 3, 2023, within two years of the accrual of the causes of action. An amendment to the Claim was timely filed with the BOP on June 29, 2023, pursuant to 28 C.F.R. § 14.2(c).

23.   BOP acknowledged receipt of the Administrative Claim and the amendment thereto in letters dated January 3, 2023 and July 18, 2023, but has failed to dispose this Claim to date. Under 28 U.S.C. § 2675(a), BOP's failure "to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time

thereafter, be deemed a final denial of the claim." In addition, under 28 C.F.R. § 14.2(c), when a pending Claim is amended, BOP "shall have six months in which to make a final disposition of the claim as amended." By the filing of this action, Plaintiff elects to deem the lack of final disposition within six months of the amendment of the Claim as the final denial of Plaintiff's Administrative Claim in its entirety. Therefore, Plaintiff exhausted requisite administrative remedies.

**PARTIES**

24. At all times relevant hereto, Plaintiff S.F.V. was an adult prisoner in the custody of BOP, incarcerated in a Federal Correctional Institution located at 5701 8th St, Dublin, CA 94568, commonly known as FCI Dublin. S.F.V. was released from BOP custody as of October 2022 and currently resides in the State of Utah.

25. As a victim of sexual assault as defined by 28 C.F.R. Part 115.6, Plaintiff respectfully seeks to use her initials instead of her actual name to protect her privacy while proceeding with this civil lawsuit. Plaintiff is entitled to protect her identity in this public court filing by not disclosing her full name, given the extremely sensitive and graphic nature of her allegations. Plaintiff will need to divulge matters that are highly sensitive and of a personal nature, and revealing her name would pose a risk of retaliatory harm to the Plaintiff or unwarranted intrusion of her privacy.

26. Defendant United States of America (hereinafter "United States") is the appropriate defendant for Plaintiff's claims under the Federal Tort Claims Act. The United States is a sovereign entity that has waived its immunity for certain claims, including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur within the scope of their employment.

27. At all times relevant hereto, Defendant United States, acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all BOP matters including at FCI Dublin and was responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, including but not limited to Defendants Nicholas Ramos

and John/Jane Does 1 through 10.

28.    In addition, at all relevant times, United States was responsible for enforcing the rules of the BOP, and for ensuring that BOP personnel obey the Constitution and laws of the United States.

29.    At all times relevant hereto, Defendant United States, acting through the BOP, hired Defendants Nicholas Ramos and John/Jane Does 1 through 10 to serve as "correctional officers" and "law enforcement officers" within the meaning and powers of 28 U.S.C. § 2680(h).

30.    At all times relevant hereto, Defendant Nicholas Ramos was a Correctional Officer and/or an employee of BOP and Defendant United States. In his capacity as an agent, servant, and employee of Defendant United States, and within the course and scope of his employment as such, Defendant Ramos was responsible for the day-to-day oversight, supervision, care, custody, control, direction, safety, and well-being of people confined at FCI Dublin, including Plaintiff. As Defendant Ramos is deceased, he is sued through his estate.

31.    At all times relevant hereto, Defendants John/Jane Does 1 through 10 (hereinafter "Defendants Does 1-10"), whose actual names, identities, and capacities are not known to Plaintiff despite reasonable efforts to obtain such information, and who are sued herein by the fictitious designation of "Does," were persons, entities, and/or corporations in charge of the custodial care provided to Plaintiff during relevant times. Specifically, Defendants Does 1-10, acting within the scope of their capacity as agents, servants, contractors, and employees of BOP and/or Defendant United States, either had supervisory authority or the opportunity to observe and intervene with respect to Defendant Ramos's sexual abuse at FCI Dublin. If and when the true names, identities, or capacities of such fictitiously designated Defendants are ascertained, Plaintiff will ask leave of this Court to amend this Complaint to assert their true names, identities, and capacities, together with the allegations pertaining to such Defendants.

32.    In performing the acts and/or omissions contained herein, Defendants, and

each of them, acted under color of federal law, and each acted maliciously, callously, intentionally, recklessly, with gross negligence, and with deliberate indifference to the rights and personal security of Plaintiff. Each of them knew or should have known that their conduct, attitudes, actions, and omissions were a threat to Plaintiff and to her constitutionally and statutorily protected rights. Despite this knowledge, Defendants failed to take steps to protect Plaintiff and to ensure that her rights were adequately protected while in the custody of Defendants.

33.     At all times relevant hereto, each Defendant was the agent, representative, or employee of each other Defendant. At all times relevant hereto, each Defendant was acting within the course and scope of said alternative agency, representation, or employment and was within the scope of their authority, whether actual or apparent. At all times relevant hereto, each Defendant was the authorized agent, partner, servant, or contractor of each other Defendant, and the acts and omissions herein alleged were done by them acting through such capacity, within the scope of their authority, with the permission, ratification, approval, and consent of each other Defendant. Accordingly, each of them is jointly and severally liable to Plaintiff.

## JURY DEMAND

34.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues and claims in this action that are so triable, including but not limited to her *Bivens* and state law claims.

## STATEMENT OF FACTS

### INDICATIONS AND WARNING SIGNS OF RAMOS's SEXUAL ABUSE

35.     Since Defendant Ramos was first hired by Defendant United States as a Correctional Officer in or around 2017, the warning signs of his perversion were ample and obvious to any reasonable BOP personnel.

36.     Over the next several years until his departure from FCI Dublin in or around 2022, Defendant Ramos utilized similar methods to stalk, assault, abuse, and terrorize numerous victims incarcerated at FCI Dublin. His routines and *modus operandi* involved

flagrant violations of FCI Dublin's security and operating protocols, which were and should have been obvious to other BOP personnel.

37.     Defendant Ramos and Officer Saucedo started working at FCI Dublin around the same time in 2017, and continued to work closely together until they were both placed on administrative leave in March 2022 for a sex abuse scandal.

38.     From at least 2017 onward, Defendant Ramos's inappropriate interactions with female prisoners were pervasive and obvious. By around 2018, Ramos and Saucedo, together with some other officers, created a system where they would put some food, perfumes, alcohol, and spices in a trash bag and told women who complied with their sexual demands to go "get the trash" where their "payment" could be found. This system was widely known throughout FCI Dublin, both to prisoners and staff. Nonetheless, BOP took no steps to ensure that Ramos would not continue to approach, accost, harass, abuse, or assault additional victims, as he was allowed to roam free in the housing units and interact with numerous female prisoners as a Correctional Officer. Furthermore, he (together with Saucedo) assumed position in the control room, so as to control the security cameras, and also in the prison yard, so as to exercise power over women who were assigned to work in the yard.

39.     From at least 2018 onward, it was common knowledge among BOP personnel as well as prisoners at FCI Dublin that Defendant Ramos continued to engage in sexually abusive and inappropriate conduct with prisoners. Other correctional officers and/or counselors and/or unit managers including Defendants Does 1-10 observed Ramos openly discussing prisoners' appearances or body types, telling them about his sexual preferences, and spending substantial amounts of time with incarcerated women by himself—in their cells, in the showers, in the yard, or in other secluded locations within the facility. This was a highly unusual behavior that could not be explained by a legitimate purpose. Nonetheless, BOP personnel failed or refused to stop Ramos's conduct. If BOP personnel had conducted prompt inquiry into Ramos's suspicious conduct, they would have discovered and stopped Ramos's sexual abuse before he came to assault the Plaintiff.

[4527071.2]

11

[Case No. 4:24-cv-04233]

COMPLAINT
DEMAND FOR JURY TRIAL

40.     Upon information and belief, throughout relevant times, Defendant Ramos underwent annual staff training regarding the Prison Rape Elimination Act ("PREA") at FCI Dublin. Congress enacted PREA in 2003, 34 U.S.C. §§ 30301, *et seq.* to establish national standards for preventing and responding to sexual abuse of prisoners. Pursuant to PREA, the U.S. Department of Justice promulgated certain regulations, which remain binding on all BOP facilities including FCI Dublin. *See* 28 C.F.R. § 115. Under PREA regulations, BOP is required to "train all employees who may have contact with inmates" on the following: its "zero-tolerance policy for sexual abuse and sexual harassment"; "the right of inmates to . . . be free from retaliation for reporting sexual abuse and sexual harassment"; "signs and dynamics of prison sexual abuse"; and "how to avoid inappropriate relationships with inmates." *Id.* § 115.31(a). Ramos was trained and was therefore aware of these mandatory binding regulations, but he blatantly violated them.

41.     From 2019 onward, it was Warden Garcia, who was eventually convicted of sexual abuse himself, that led staff training at FCI Dublin regarding PREA. Until his removal from FCI Dublin in or around July 2021, Garcia was also FCI Dublin's PREA compliance officer. As established through a subsequent criminal trial, between 2019 and 2021, Garcia was sexually assaulting at least three victims on repeat occasions—demonstrating by his own behavior that sexual abuse was normal and acceptable at FCI Dublin regardless of the purported PREA training. As the Inspector General stated following Garcia's criminal trial, he "created a heinous culture that failed to protect female inmates from widespread sexual abuse and violence at the hands of other Dublin employees."[2] Many officers at FCI Dublin, including Defendant Ramos, interpreted Garcia's conduct as *carte blanche* to do with the prisoners as they pleased.

42.     Defendant Ramos took advantage of FCI Dublin's culture and Warden Garcia's leadership to sexually assault numerous victims. Ramos's sexually abusive

---

[2] U.S. Attorney's Office, *Press Release, Former Federal Prison Warden Sentenced to More Than Five Years In Prison For Sexual Abuse of Three Female Inmates* (Mar. 22, 2023), https://www.justice.gov/usao-ndca/pr/former-federal-prison-warden-sentenced-more-five-years-prison-sexual-abuse-three.

[4527071.2]                                    12                                    [Case No. 4:24-cv-04233]

COMPLAINT
DEMAND FOR JURY TRIAL

conduct escalated and progressed over time. Even when there were other prisoners or BOP personnel around, Ramos would push and grind his body against certain prisoners including S.F.V. and order them to follow him to "blind spots" that were not captured by security cameras. For years, BOP personnel knew of, and disregarded, Ramos's conduct.

43.     Defendant Ramos oversaw custodial supervision throughout FCI Dublin as a Correctional Officer, and within that capacity, he knew to identify various blind spots that fell outside of the view of the security cameras. There were numerous such blind spots throughout FCI Dublin, including but not limited to prison cells, officer station, and the yard. Ramos repeatedly took advantage of these known blind spots to brutally abuse his victims, including by fondling their breasts and buttocks, grinding against their body, ordering them to undress and show him their breasts and buttocks. Other BOP officers knew of, and disregarded, Ramos's abnormal behavior where he repeatedly isolated himself with certain prisoners. If BOP personnel had conducted prompt inquiry into Ramos's suspicious conduct, they would have discovered and stopped Ramos's sexual abuse before he came to assault the Plaintiff.

44.     Sometimes, Defendant Ramos engaged in sexually abusive conduct even in the vicinity of security cameras. Upon information and belief, Ramos knew that the control room officers who were monitoring the security cameras, including Officers Saucedo and Lagade (or Lagode), would not report, intervene, or stop his conduct. Hence, Ramos told his victims that he was not concerned about security cameras.

45.     Given the overtness and frequency with which Ramos preyed on women who were under his custody, other BOP personnel suspected or should have suspected that Ramos was sexually abusing prisoners. Binding PREA regulations mandate staff reporting, where all BOP staff are required to "report immediately . . . **any knowledge, suspicion, or information** regarding an incident of sexual abuse or sexual harassment that occurred in a facility. . .; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." 28 C.F.R. § 115.61(a). When an incarcerated person is subject to a substantial

COMPLAINT
DEMAND FOR JURY TRIAL

risk of imminent sexual abuse, BOP shall take immediate action to protect that person. *See* 28 C.F.R. § 115.62. In addition, administrative investigations of alleged sexual abuse by a staff member are required to proceed "promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports." *Id.* § 115.71(a). The presumptive disciplinary sanction for substantiated allegations of sexual abuse is termination. *See id.* § 115.76(b). Victims shall also be offered medical and mental health care by the BOP. *See id.* § 115.83.

46.     By 2019, Defendant United States and its agents, servants, contractors, and employees had numerous opportunities to follow the above-mentioned mandates and stop Defendant Ramos's misconduct. Ramos's action was abnormal, obvious, and suspicious for sexual misconduct. In addition, upon information and belief, correctional officers in the control room were charged with monitoring the security cameras and following up on any suspicious activities that they noticed on the cameras. These officers saw or should have seen that Defendant Ramos frequently disappeared into unmonitored areas with prisoners who were not authorized to be in those areas alone with an officer. Nevertheless, BOP personnel took no actions to investigate or stop Ramos's suspicious and recurrent behavior.

47.     Agents, servants, contractors, and employees of BOP, including at least some of the unit managers, counselors, correctional officers, lieutenants, associate wardens, wardens, and investigators at FCI Dublin during relevant times, were aware of suspicions, indications, or concerns regarding Defendant Ramos's sexual misconduct. They were aware of Ramos's frequent protocol violations and unexplained suspicious interactions with certain prisoners. Nonetheless, they refused to take the required action to report, monitor, supervise, or investigate Ramos and allowed him access to female prisoners as a Correctional Officer.

48.     Defendant United States and its agents, servants, contractors, and employees failed to investigate, discipline, supervise, monitor, question, or stop Defendant Ramos despite numerous indications of sexual misconduct. This was in direct violation of

mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

49.    It is extraordinary and inexplicable that the United States continued to allow Defendant Ramos to spend alone time with female prisoners in isolation, creating daily opportunities for him to commit additional sexual assaults.

50.    Emboldened by other BOP personnel's acquiescence with his misconduct, Defendant Ramos further escalated his sexual abuse in 2020. He abused the institutional resources and power he had as a senior correctional officer to sexually abuse numerous vulnerable victims. He became notorious throughout FCI Dublin for asking women to have sex with him and to expose their breasts or buttocks to him through the window on their cell doors. It was impossible for other supervisory and correctional officers at FCI Dublin to remain ignorant of his conduct and reputation.

51.    Other employees at FCI Dublin knew about Defendant Ramos's repeated sexual abuse of female prisoners and failed to report him or to take other steps to stop it. Throughout Ramos's tenure as a Correctional Officer, FCI Dublin's personnel failed to follow PREA mandates and continued to turn a blind eye towards signs of sexual misconduct, thereby enabling sexual assaults to occur throughout the facility routinely and continuously. The fact that Defendant Ramos could get away with sexual abuse while flagrantly violating BOP's policies led his victims, including the Plaintiff, to believe that Ramos was untouchable. The victims had legitimate and genuine concerns that they would suffer retaliation or other substantial harm if they were to report Ramos's predatory behavior.

52.    Defendant Ramos's *modus operandi* included coercing his victims into compliance by threatening them with disciplinary or punitive measures. Ramos abused his authority and flaunted his power, frequently telling his victims that nothing would happen to him even if they reported his sexual misconduct. Victims including the Plaintiff were aware of Ramos's reputation that he verbally and physically assaulted women, destroyed their property, and sent them to the SHU if they tried to resist or stop his advances. While

they are in the SHU, prisoners lose access to the bare modicum of privileges they have, including access to phone, mail, and recreation time. Ramos took advantage of the widespread fear of SHU at FCI Dublin, and his close relationship with the administrators including Warden Garcia and SIS Lieutenant Putnam, to manipulate, terrify, and intimidate his victims including the Plaintiff.

## HISTORY OF SEXUAL ABUSE AT FCI DUBLIN

53.     Astonishingly, sexual abuse by Defendant Ramos and seven other officers who have been convicted of sexual abuse in related criminal cases, is just the latest incidence of a long and sordid history of recurring sexual abuse at FCI Dublin.

54.     There have been other publicized incidents of female prisoners at FCI Dublin being sexually abused by male BOP employees. In 1996, three women were brought to a male housing unit at an adjacent facility where BOP officers opened their cell doors, allowing male prisoners to rape them. In the 1990's and 2000's, at least four BOP employees were convicted of sexual abuse of female prisoners at FCI Dublin.[3] In the 2010's, a dozen BOP employees were removed from FCI Dublin for sexually abusing prisoners, although none of them were arrested.[4]

55.     In 2019, a victim reported to FCI Dublin staff, FBI, and the U.S. Attorney's Office that she had been raped by then-Chaplain of FCI Dublin, James Highhouse. While Highhouse initially denied the allegations and continued to work at FCI Dublin, the woman's courage eventually led to a criminal indictment being filed against Highhouse in 2022. Through the criminal case and the ultimate guilty plea, it was revealed that Highhouse had sexually abused at least six women between 2014 and 2019.

[3] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 18 (Dec. 13, 2022), https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-12-13%20PSI%20Staff%20Report%20-%20Sexual%20Abuse%20of%20Female%20Inmates%20in%20Federal%20Prisons.pdf.

[4] *Id.*

56.     Highhouse's case prompted a broader criminal investigation, which eventually led to a wave of criminal charges being filed against a total of eight former FCI Dublin employees including Defendant Ramos. As described above, except for Ramos, seven other charged officers have already been convicted of, or pled guilty to, sexually abusing prisoners, while Ramos awaits trial. In each case, there were additional victims who suffered sexual abuse by the same officer, who were acknowledged as part of the court records but not included as part of official criminal charges.

57.     Despite BOP's purported zero-tolerance policy, sexual abuse of incarcerated people is an issue endemic to BOP, beyond FCI Dublin as well. In 2022, the U.S. Senate Permanent Subcommittee on Investigations issued a report (hereinafter "the PSI Report"), which found that over the past decade, BOP employees sexually abused female prisoners in at least two-thirds of federal prisons that have held women (19 out of 29 facilities).[5] The PSI Report found that Defendant United States' management failures enabled continued sexual abuse of incarcerated people by BOP personnel. The PSI Report specifically found that the United States, through BOP, "failed to detect, prevent, and respond to sexual abuse of female prisoners in its custody."[6]

58.     Despite this established history of sexual abuse in BOP custody and at FCI Dublin specifically, Defendant United States failed to institute a reliable way of detecting and stopping sexual abuse of incarcerated people. As a telling example, FCI Dublin's PREA audit report that was published on March 12, 2022, claimed that FCI Dublin was compliant with all PREA standards. Even though this audit report was published **after** Warden Garcia's sexual abuse became public through criminal investigation, sexual misconduct by Ramos or other officers who were working under Garcia during the relevant period cannot be found anywhere in the report. This blatant deficiency of the audit reflects the culture of Defendant United States and of BOP, of turning a blind eye to prison

---

[5] *Id.* at 1.

[6] *Id.* at 4.

COMPLAINT
DEMAND FOR JURY TRIAL

staff sexual abuse of incarcerated people.

59.    Based on the history of sexual abuse at FCI Dublin, Defendants had actual notice and knowledge that correctional officers could abuse their position of power to assault prisoners, including in off-camera areas.

60.    Nevertheless, Defendants failed to take adequate steps to prevent Defendant Ramos from engaging in recurrent sexual abuse, including by installing additional security cameras to eliminate the blind spots. This was in direct violation of mandatory and non-discretionary BOP policies, which required that BOP staff eliminate any known blind spots and install sufficient video monitoring to prevent sexual abuse.

61.    Defendant United States and its agents, servants, contractors, and employees failed to remedy the culture of staff sexual abuse at FCI Dublin before, during, and after Defendant Ramos's sexual assaults of the Plaintiff.

### RAMOS's SEXUAL ABUSE OF PLAINTIFF

62.    Emboldened by other BOP personnel's failure to stop him, and their apparent willingness to empower him with continued access to vulnerable female prisoners, Defendant Ramos continued his sadistic reign over FCI Dublin population. Over time, Defendant Ramos's unchecked predatory behavior predictably increased in scope and frequency. With increasing boldness, Ramos continued to use the tools available to him through the BOP, such as daily access to women, blind spots from cameras, and disciplinary authority, to violate and terrorize his victims including Plaintiff S.F.V.

63.    S.F.V. first arrived at FCI Dublin in or around November 2017 at 29 years of age and remained incarcerated there until around November 2021.

64.    During this time, Plaintiff was under the custodial care, supervision, and control of the agents, servants, employees, and independent contractors of Defendant United States and/or BOP, including Defendant Ramos and other officers at FCI Dublin whose identities are not presently known. As a matter of both federal and state law, Defendants had an absolute non-delegable duty to see that prisoners in their custody receive adequate custodial care and supervision; to maintain the safety, health, and well-

being of the prisoner population; and to prevent prisoners such as the Plaintiff from being subjected to undue harm and/or cruel and unusual punishment. Defendants abjectly failed to carry out these duties.

65.    S.F.V. lived in the F unit throughout the entirety of her time at FCI Dublin. She got a job working in the kitchen soon after arriving at FCI Dublin in or around November 2017 and remained in that position for about three months. However, she began working in the yard in or around the Summer of 2018. This is when she met Defendant Ramos as he was the yard officer, which meant that he was the direct supervisor for S.F.V. and other women who were working in the yard. S.F.V.'s daily duties included collecting and throwing away trash from the facility, as well as cleaning Ramos's office.

66.    Little did S.F.V. know when she started working in the yard that for the next three years, she would suffer constant sexual abuse, harassment, humiliation, threats, retaliation, and bullying by Defendant Ramos as well as his conspirator Officer Saucedo. There was no escape as she was a prisoner under their care, custody, and control.

67.    Upon information and belief, the yard officer was responsible for controlling the movement of other incarcerated individuals in and outside of the buildings at FCI Dublin. Being the yard officer gave Defendant Ramos a tremendous amount of power to call women that worked for him to the yard as he pleased—in other words, for his own sexual gratification. Unlike other jobs at FCI Dublin, which typically had more structured hours, there was no such set schedule for yard employees. Rather, the Officers would come get the women from the unit whenever there was work to be done. Typically, other Officers would come by once a day to bring women from the housing unit to the yard. However, Ramos and Saucedo would call S.F.V. to the yard much more often, sometimes up to three times in one day.

68.    S.F.V.'s housing unit officers were aware that Defendant Ramos was calling S.F.V. out to the yard and spending an unusual amount of time with her. Each time Ramos took her to the yard, he had to check in with S.F.V.'s housing unit officers. These BOP personnel should have known or suspected, by the sheer frequency of Ramos pulling

S.F.V. out of the unit and onto the yard, that something inappropriate was occurring. There was no legitimate explanation for this abnormal behavior.

69. S.F.V.'s first impression of Defendant Ramos was that he was strict, cruel, and hostile; and everyone seemed to be afraid of him. He seemed to hold an enormous amount of power at FCI Dublin, and was close to higher-level officers including Warden Garcia and SIS Lieutenant Putnam.

70. A few months after she started working in the yard, towards the end of 2018, Defendant Ramos began sexually harassing S.F.V. by making inappropriate comments about her appearance—eyes, skin, and eventually fixated on breasts. He would isolate himself with S.F.V. by taking her on his daily patrols, telling her personal things about his sexual encounters. It was highly abnormal and suspicious for a Correctional Officer to perform rounds together with a prisoner, and therefore, Ramos's behavior should have raised immediate alarm bells regarding inappropriate sexual predation.

71. In the following weeks, harassment escalated as Defendant Ramos kept commenting on S.F.V.'s breasts. S.F.V. froze with fear and became extremely anxious when Ramos said things like this, not knowing how to respond. She felt humiliated, embarrassed, and degraded.

72. S.F.V. knew that she could not formally report Defendant Ramos's sexual abuse. Other incarcerated women at FCI Dublin attempted to report Ramos's perverted behavior to certain unit managers, counselors, and/or correctional officers including Dr. Mike Hoang, Warden Ray Garcia, and Lieutenant Stephen Putnam. Nonetheless, these officers violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility." In the alternative, if these officers in fact reported their suspicion or knowledge pursuant to the regulations, the administrators who received the report failed to take appropriate action to immediately investigate and sanction Ramos for his conduct.

[4527071.2]                                      20                              [Case No. 4:24-cv-04233]

73. Defendant Ramos also began to bring S.F.V. "gifts" including make-up, sweaters, clothes, and special food. Ramos obtained these items from other women's cells by conducting searches and confiscating objects. Other BOP personnel should have noticed S.F.V. in possession of various items that she was not supposed to have, and inquired further as to their source—which was obviously Defendant Ramos.

74. Sexual harassment further escalated as Defendant Ramos began telling S.F.V. that he had sexual dreams about her. He would go into detail about the graphic sexual acts they would engage in his dreams. Even though it was obvious that S.F.V. felt extremely uncomfortable, Ramos would taunt S.F.V. by saying that he had another one of "those good dreams"—including in the presence of other prisoners, showing her that he could get away with anything. His constant comments about S.F.V.'s body, like "I like your boobs," never stopped either.

75. For example, one dream that S.F.V. recalls Defendant Ramos describing to her involved them going to Las Vegas together. He told her that in this dream, Ramos bent S.F.V. over the bed in a hotel room and was penetrating her from behind. He told her that in the dream, the actions "felt so real and felt so good."

76. To this day, several years later, S.F.V. recalls how humiliating it was to have Ramos make degrading sexual comments to her in front of other prisoners. For example, on one occasion, another prisoner L.G. heard Ramos telling S.F.V. "You freak, you are always on the floor," while S.F.V. was cleaning the floor. Another woman, A.P. had heard Ramos call S.F.V. "nasty," among other insults.

77. In addition to being sexually abusive, Ramos would also abuse S.F.V. in other ways. Ramos would discriminate against and humiliate S.F.V. based on her sexual orientation, as she identified as lesbian or bisexual, as well as her immigration status. He would openly taunt her in front of other people, including Officer Saucedo, by calling her derogatory names in Spanish which translate to "dirty" or "freak" in English, or telling people that she will be deported as "she is illegal." S.F.V. was mortified.

78. While sometimes acting nice and friendly towards her, Defendant Ramos

[4527071.2]

21

COMPLAINT
DEMAND FOR JURY TRIAL

[Case No. 4:24-cv-04233]

would suddenly turn abusive and violent, and enlist his friend Officer Saucedo in tormenting S.F.V. as well. For instance, Ramos and Saucedo took advantage of their positions of power by calling on S.F.V. to do menial tasks—for example, having her come to the yard simply to pick up a tissue off the ground. They also searched her room about two or three times per week on average without justification, which was abnormal. They would confiscate her property, such as shirts, make-up, sweatpants, and often underwear, without explanation. Upon information and belief, the existing protocols at FCI Dublin required Correctional Officers to fill out confiscation forms when removing items from an incarcerated person's cell during a search; however, Ramos and Saucedo never filled out these forms, preventing S.F.V. from appealing the confiscation in order to get her property back.

79. The only explanation for this constant harassment was that Ramos and Saucedo wanted to keep S.F.V. under their predatory reign. They wanted to show her their power, and imply what would happen to her if she tried to resist them.

80. Not only did Defendant Ramos sexually harass and torment S.F.V., but he also became jealous of her other friendships and used his power to make other women stay away from her. He threatened to hit other women's cells and confiscate all their property if they so much as talked to S.F.V or sat with her. S.F.V. was extremely sad and disturbed that Ramos was cutting her off from her peers, and realized that he wanted to isolate her to make her easy prey for himself.

81. Defendant Ramos carried through on his threats as well. When S.F.V. became friends with a woman, V.R., Ramos actually began to "hit" V.R.'s cell and confiscate or destroy all her property. When S.F.V. and V.R. asked why he was doing this, he replied, "because I f*cking want to and because I f*cking can."

82. Additionally, Ramos and Saucedo would force V.R. to get out of her wheelchair and use crutches while getting food. At least three times, they confiscated her wheelchair. It was obvious that they were torturing V.R. in a ploy to flaunt their power to S.F.V.

83. S.F.V. and V.R. even reported Ramos and Saucedo to the Associate Warden at the time, FNU Williams. While AW Williams acknowledged that Ramos and Saucedo shouldn't do this, nothing else was done to stop them, and they continued to retaliate against V.R. in this vicious way. Another time, they took V.R.'s wheelchair in the presence of another Officer, Officer Hung, who turned a blind eye by walking away and doing nothing to help V.R., despite S.F.V.'s pleas to him: "Are you going to let them do this?"

84. S.F.V. found herself trying to avoid Ramos and Saucedo at all costs. She would skip meals. She would not so much as smile at another staff member or prisoner, lest Ramos and Saucedo get upset. In fact, when he saw S.F.V. smiling at another officer, Defendant Ramos threatened her that he would hit her room if she did that again.

85. Unfortunately, Defendant Ramos's abuse of S.F.V. did not end there. As part of his scheme to sexually abuse her, Ramos continued to constantly call S.F.V. out into the yard and make her spend time alone with him. While her cellmate, L.G, would sometimes accompany her, Ramos would split them up and make them work in different areas so that S.F.V. would again be left alone with Ramos.

86. There are four primary physical incidents that S.F.V. recalls. During the first incident, sometime in 2020, Defendant Ramos had S.F.V. clean the bathroom in his yard office. He approached S.F.V. from behind while she was cleaning the bathroom, claiming that he needed to wash his hands. Instead of slipping past her normally, Ramos rubbed his erect penis against her back and buttocks from side to side. S.F.V. froze and recalls feeling shocked and humiliated. S.F.V. recalls Ramos laughing, as he walked away and returned to his desk.

87. The second assault was similar. This time, he entered the bathroom while she was cleaning, claiming to need paper towels. He again proceeded to rub his erect penis against her back and buttocks in a masturbatory fashion. S.F.V. recalls his laughter to this day. There was no security camera in this bathroom.

88. Those who were monitoring the security cameras, including Officers Sergio Saucedo and FNU Lagade (or Lagode), saw that Defendant Ramos would frequently go

COMPLAINT
DEMAND FOR JURY TRIAL

out of camera views to spend time alone with S.F.V. Incarcerated people are not allowed to be alone in an off-camera area with an officer. Nonetheless, these officers did not report, investigate, inquire about, intervene, or stop his conduct, also in violation of applicable BOP protocols as well as regulations including 28 CFR § 115.61. In the alternative, if these officers in fact reported their suspicion or knowledge pursuant to the regulations, the administrators who received the report failed to take appropriate action to immediately investigate and sanction Ramos for his conduct. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States towards the risk of sexual abuse that incarcerated women faced at FCI Dublin.

89.    Indeed, Officer Saucedo was known for being complicit with Defendant Ramos's sexual abuse and serving as his lookout, especially as Saucedo was often charged with monitoring the security cameras throughout FCI Dublin in the control room.

90.    During the third incident, which was shortly after the second incident, S.F.V. was again alone with Defendant Ramos in his yard office. S.F.V. was walking past Ramos as he sat in his desk chair. Ramos reached his hand out towards S.F.V. and attempted to grope her breast. S.F.V. was extremely shaken by his escalating behavior. She could feel her heart racing and felt that there was no way to get away from Ramos.

91.    In or around May 2021, Defendant Ramos sexually assaulted S.F.V. for a fourth time. Again, S.F.V. was at work when Ramos' assault occurred. This time, she was walking to take out the trash in the back of the prison yard near the kitchen. Ramos approached her from behind and rubbed his erect penis against her back and buttocks. During this assault, Ramos asked S.F.V., "Are your boobs real? They are nice."

92.    S.F.V. continued to work in the yard up until the Summer of 2021, a few months before her transfer out of FCI Dublin. However, she could not escape Ramos. Even after she stopped working at the yard, he continued to sexually harass her by making comments about her body and telling her about his sexually explicit dreams until her transfer to a different BOP facility in around November 2021.

93.    Notably, due to the culture of abuse and retaliation at FCI Dublin, S.F.V. felt

that there was no safe way to report Ramos and Saucedo's abuse while she was still incarcerated there. She had seen how officers turned a blind eye to the wrongdoing of other officers when she and V.R. had tried to report Ramos and Saucedo to Officer Hung.

94.     Additionally, S.F.V. and her cellmate L.G. together tried to report Ramos and Saucedo's harassment to Counselor Stephanie Millikin in the beginning of 2021. S.F.V. was still too afraid to go into the details of the sexual assaults, but reported that Ramos and Saucedo would bother her all the time and "hit" her room constantly. In response, Officer Millikin told S.F.V. that she needed to report the harassment to OIG directly, because as a Counselor at the facility, she was limited in what she could do. Office Millikin added that in her experience, if a Counselor reports inappropriate behavior of another staff member, nothing gets done.

95.     Hearing that even a Counselor's report is ineffective, S.F.V. did not feel that she could do anything as an incarcerated person. She had witnessed other women, including A.R., being sent to the SHU after reporting staff sexual abuse. Moreover, after these women were released from the SHU, they would get sent back to work with their abusers where the abuse only worsened. S.F.V. did not feel that she could risk further retaliation.

96.     However, Saucedo's verbal harassment and bullying had gotten to a point where S.F.V. still made one more attempt in mid-2021 to report him to Lieutenant FNU Golden. However, nothing was done to protect her from either Ramos or Saucedo until her transfer from FCI Dublin in November 2021.

97.     S.F.V. could only escape Defendant Ramos's constant propositions, sexual advances, sexual assaults, and sexually explicit comments, as well as Saucedo's verbal harassment, when she was transferred out of FCI Dublin in November 2021. After arriving at a different BOP facility, in or around September 2022, she finally felt safe to disclose the sexual abuse she suffered from Ramos to a counselor and a psychologist. Around this time, S.F.V. sought counsel and reported Ramos's sexual abuse to the U.S. Attorney's Office in or around October 2022. The fact that she was released from BOP custody

altogether in October 2022 gave her the courage to do so.

98. Defendant Ramos's sexual assaults have left S.F.V. with marked emotional distress, severe impairment in functioning, and severe symptoms of PTSD. The sexual assaults reminded her of the past trauma that she had suffered as well, including childhood sexual abuse, domestic violence, and rapes by an intimate partner.

99. S.F.V. has been diagnosed with PTSD due to the sexual assaults by Officer Ramos and additional abuse and harassment perpetuated by him and Officer Saucedo. She continues to suffer from long-term negative effects including intrusive memories of the assault, dissociation, cognitive avoidance, feelings of guilt and shame, diminished interest and participation in her relationships, and hypervigilance.

100. Upon information and belief, other FCI Dublin staff, including without limitation, Warden Garcia, Associate Warden Williams, Officers Saucedo, Hung, Millikin, and Lagade/Lagode, Lieutenants Putnam and Golden, and Dr. Mike Hoang, knew or should have known about Defendant Ramos's sexually abusive conduct towards S.F.V., and yet did nothing to stop his assaults.

101. In summary, Defendant Ramos had unlimited, unmonitored access to prisoners including Plaintiff, which allowed him to sexually abuse her on numerous occasions between 2018 and 2021. There were many missed opportunities for other BOP personnel to stop Defendant Ramos's crime. Despite being aware of Ramos's suspicious behavior, officers refused to take any action, allowing him to act with impunity.

102. BOP personnel violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility."

103. In violation of mandatory BOP policies and federal regulations, Defendant United States' agents, servants, contractors, and employees at FCI Dublin took no steps to keep the Plaintiff safe from Defendant Ramos, even though they were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed to people

under Ramos's purported custodial, supervisory, and disciplinary care.

104.   By allowing Defendant Ramos to repeatedly assault prisoners at FCI Dublin, Defendant United States' agents, servants, contractors, and employees assumed and/or acquiesced in the risk of injuring additional victims such as the Plaintiff, demonstrating a plain disregard of an excessive risk to Plaintiff's safety and welfare.

105.   Defendant United States' agents, servants, contractors, and employees knew or should have known of the substantial problems and shortcomings at FCI Dublin: in the training that staff receive regarding sexual abuse; the glaring lack of security cameras in certain locations of the facility; the system for reporting sexual abuse complaints; the treatment of victims who reported sexual abuse; the oversight of the sexual abuse prevention program, including by Warden Garcia; the actual violations of BOP security and operating protocols by Defendant Ramos; and his propensity in engaging in sexually inappropriate and abusive behavior.

106.   The repeated horrors that Defendant Ramos inflicted on the Plaintiff occurred only as a direct result of the negligence, gross negligence, carelessness, recklessness, and deliberate indifference of numerous BOP officials.

**AFTERMATH OF DEFENDANT RAMOS's SEXUAL ABUSE**

107.   Defendant Ramos's crime only came to an end when he (as well as Officer Saucedo) left FCI Dublin in or around March 2022.

108.   At this point, Warden Garcia and several other FCI Dublin officers' sexual abuse had become public knowledge due to criminal indictments. A.R.'s public report about Ramos asking her for sex therefore garnered significant media attention. It also became known that when A.R. had reported Ramos to other FCI Dublin personnel, she as a victim was penalized by being placed in the SHU; and that after her release from the SHU, Ramos brutally retaliated against her including by slamming a door into her.

109.   Before he faced criminal charges, in or around August 2022, Ramos died by suicide. Upon information and belief, Saucedo is still under investigation. Both Ramos and Saucedo have been named in numerous civil suits brought by formerly incarcerated

[4527071.2]                                    27                          [Case No. 4:24-cv-04233]
COMPLAINT
DEMAND FOR JURY TRIAL

women at FCI Dublin.

110.    To this day, S.F.V. continues to suffer from debilitating psychological trauma, permanent and catastrophic psychological injuries, severe emotional distress, permanent physical ailments associated with psychological injuries, pain, humiliation, loss of enjoyment of life, and loss of quality of life.

111.    The foregoing are permanent injuries as a direct result of Defendants' deliberate indifference to Plaintiff's health and safety, Defendants' disregard of the excessive risk of harm to Plaintiff's health and safety, and/or Defendants' negligent failure to promptly protect Plaintiff from foreseeable assaults by Defendant Ramos. Plaintiff also suffers from other permanent injuries and deficits that will be established through expert consultation in this litigation.

112.    Upon information and belief, Plaintiff will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiff's injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning. To the extent that she suffered sexual victimization prior to incarceration, Plaintiff's psychological trauma and the resulting impairment were exacerbated because of Defendant Ramos's sexual assaults.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(*Bivens* Claim for Cruel and Unusual Punishment under the Eighth Amendment)**

**(Against Defendants Estate of Ramos and Does 1-10, in their respective individual capacities)**

113.    Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

114.    At all relevant times, Defendants were acting under color of law, *to wit*, under color of Constitution, statutes, ordinances, laws, rules, regulations, policies, customs, and usages of the United States. Defendants used their color of authority and position of

[4527071.2]

28

[Case No. 4:24-cv-04233]

power with Defendant United States to accost, coerce, manipulate, threaten, harass, sexually abuse, assault, intimidate, and retaliate against the Plaintiff.

115. The Eighth Amendment to the Constitution of the United States prohibits the infliction of "cruel and unusual punishments" on those arrested and awaiting trial or those convicted of crimes, including punishments that "involve the unnecessary and wanton infliction of pain."

116. Prison staff sexual abuse of incarcerated people constitutes a form of torture that violates the Eighth Amendment. *See Bearchild v. Cobban*, 947 F.3d 1130, 1144 (9th Cir. 2020). Such abusive sexual contact also violates federal criminal law. *See, e.g.*, 18 U.S.C. §§ 2243, 2244.

117. 18 U.S.C. § 2243(b) makes it a felony for a BOP employee to "knowingly engage[] in a sexual act with another person who is (1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging." Consent is not a defense to this crime, considering the inherently unequal power dynamic between BOP employees and prisoners. As the OIG explained in a 2005 report regarding prison staff sexual abuse, prisoners are precluded from having the same ability as staff members to consent to a sexual relationship. Simply put, there is no scenario under which an incarcerated person can give consent to sexual contact, harassment, or abuse by BOP personnel.

118. Defendants have deprived Plaintiff of her Constitutional rights under the color of federal law and are thus liable to Plaintiff pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and its progeny including *Carlson v. Green*, 446 U.S. 14 (1980) and *Farmer v. Brennan*, 511 U.S. 825 (1994).

119. Defendants subjected Plaintiff to cruel and unusual punishment as defined by the Eighth Amendment when they sexually abused, assaulted, and harassed the Plaintiff and provided or withheld certain privileges in order to coerce sexual favors or silence regarding sexual abuse from the Plaintiff.

120. Defendant Ramos intentionally and repeatedly sexually abused Plaintiff, in reckless and callous disregard of Plaintiff's clearly established rights to be free from cruel and unusual punishment, as guaranteed under the Fifth and Eighth Amendments to the United States Constitution.

121. Defendant Ramos's sexual abuse of Plaintiff was severe and repetitive, and caused Plaintiff physical pain and emotional trauma. His assaults on Plaintiff served no legitimate penological purpose.

122. Defendant Ramos's sexual abuse of Plaintiff was perpetrated with the subjective intent to gratify Ramos's sexual desire and to humiliate Plaintiff.

123. The abuse occurred under coercive circumstances, and by intentionally subjecting Plaintiff to these acts, Defendants acted maliciously, in a manner that is deeply offensive to human dignity and void of penological justification.

124. Defendant Ramos was aware of the criminal and wrongful nature of his conduct and yet refused to stop or rectify his behavior. He acted with deliberate and/or reckless disregard of the risk that Plaintiff's constitutional and civil rights would be violated.

125. Additionally, Defendants' conduct and omissions also deprived Plaintiff of her clearly established rights under the Fifth and Eighth Amendments to the United States Constitution to be free from cruel and unusual punishment, in that they refused to acknowledge or respond to Defendant Ramos's history of sexual abuse and denied adequate protection to people incarcerated at FCI Dublin, although they knew or should have known that doing so posed an excessive and irreversible risk to Plaintiff's safety and welfare.

126. Defendants contributed to, and took advantage of, FCI Dublin's culture, turning a blind eye towards sexual harassment, abuse, and assaults of incarcerated people. Defendants knew, and ensured, that there would be no consequences for sexually abusive conduct at FCI Dublin.

127. Defendants deliberately disregarded numerous warning signs, indications,

and complaints regarding Defendant Ramos's sexually abusive behavior. They refused to take reasonable measures to provide Plaintiff with a reasonably safe environment, and instead allowed Ramos to roam free in FCI Dublin without any restraints or supervision.

128. Defendants knew or should have known that there was a high degree of risk that prisoners, and Plaintiff in particular, would be sexually assaulted. Nonetheless, Defendants assisted in creating and increasing the danger to Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Defendant Ramos's recurrent sexual abuse. They enabled and acquiesced in Ramos's conduct, thereby placing Plaintiff directly in harm's way.

129. Moreover, Defendants did not properly penalize, discipline, or train Defendant Ramos to ensure that he would not continue to pose danger to the Plaintiff. Ramos operated with impunity in an environment in which he knew he would not be adequately supervised, trained, or disciplined.

130. Each of the Defendants deprived Plaintiff of her right to be free from cruel and unusual punishment by subjecting her to a substantial risk of serious harm including sexual abuse, by acting in conscious disregard of that known risk.

131. Each of the Defendants affirmatively used his or her authority in a way that created a danger to Plaintiff or that rendered Plaintiff more vulnerable to danger.

132. Each of the Defendants acted with a degree of culpability that shocks the contemporary conscience.

133. Each of the Defendants knew of and disregarded the excessive risk of harm to Plaintiff's health and safety.

134. Each of the Defendants was aware of facts from which the inference could reasonably be drawn that Defendants had an opportunity to intervene and prevent the exacerbation of Plaintiff's injuries and damages, and yet did not do so and instead inflicted unnecessary pain and suffering.

135. Such actions of each Defendant caused to subject the Plaintiff in the custody or under the physical control of the United States government to cruel, inhuman, or

degrading treatment or punishment prohibited by the Fifth and Eighth Amendments to the Constitution of the United States and constitute a blatant violation of Plaintiff's civil rights secured by laws of the United States.

136. As a direct and proximate result of the foregoing, Plaintiff S.F.V. suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

137. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

138. Plaintiff also demands the imposition of exemplary and punitive damages as to this Cause of Action, as the Defendants' conduct was malicious, willful, wanton, callous, and reckless.

139. Defendant Ramos's horrific abuse constitutes willful or malicious violation of Plaintiff's constitutional, statutory, and civil rights, which justifies an award of exemplary and punitive damages.

140. Defendants' deliberate indifference in their refusal to provide necessary protection to vulnerable prisoners including Plaintiff and/or their direct refusal to intervene once they observed or were notified about Defendant Ramos's sexual abuse constitutes willful or malicious violation of Plaintiff's constitutional, statutory, and civil rights, which justifies an award of exemplary and punitive damages.

141. The egregious circumstances surrounding the treatment of Plaintiff at relevant times, which caused her to suffer the injuries and damages as set forth above, justify an award of exemplary and punitive damages.

142.    Therefore, in addition to compensatory damages, Plaintiff seeks an award of exemplary and punitive damages, reasonable attorneys' fees, and costs against Defendants as for this Claim.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

## SECOND CLAIM FOR RELIEF

**(*Bivens* Claim for Violation of Due Process Rights under the Fifth Amendment)**

**(Against Defendants Estate of Ramos and Does 1-10, in their respective individual capacities)**

143.    Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

144.    At all relevant times, Defendants were acting under color of law, *to wit*, under color of Constitution, statutes, ordinances, laws, rules, regulations, policies, customs, and usages of the United States. Defendants used their color of authority and position of power with Defendant United States to accost, coerce, manipulate, threaten, harass, sexually abuse, assault, intimidate, and retaliate against the Plaintiff.

145.    Defendants' conduct deprived Plaintiff of her substantive due process rights protected under the Fifth Amendment to the United States Constitution, in that they failed and refused to provide Plaintiff with proper custodial care and/or protection although they knew or should have known that doing so posed an excessive risk to Plaintiff's safety and welfare. Defendants also provided or withheld certain privileges without due process, so as to coerce sexual favors or silence regarding sexual abuse from the Plaintiff.

146.    Defendant Ramos intentionally and repeatedly sexually abused Plaintiff, in reckless and callous disregard of Plaintiff's clearly established rights to be free from cruel and unusual punishment, as guaranteed under the Fifth and Eighth Amendments to the United States Constitution.

147.    Defendant Ramos's sexual abuse of Plaintiff was severe and repetitive, and caused Plaintiff physical pain and emotional trauma. His assaults on Plaintiff served no legitimate penological purpose.

[4527071.2]

33

[Case No. 4:24-cv-04233]

COMPLAINT
DEMAND FOR JURY TRIAL

148. Defendant Ramos's sexual abuse of Plaintiff was perpetrated with the subjective intent to gratify Ramos's sexual desire and to humiliate Plaintiff.

149. The abuse occurred under coercive circumstances, and by intentionally subjecting Plaintiff to these acts, Defendants acted maliciously, in a manner that is deeply offensive to human dignity and void of penological justification.

150. Defendant Ramos was aware of the criminal and wrongful nature of his conduct and yet refused to stop or rectify his behavior. He acted with deliberate and/or reckless disregard of the risk that Plaintiff's constitutional and civil rights would be violated.

151. Additionally, Defendants' conduct and omissions also deprived Plaintiff of her clearly established rights under the Fifth and Eighth Amendments to the United States Constitution, in that they refused to acknowledge or respond to Defendant Ramos's history of sexual abuse and denied adequate protection to people incarcerated at FCI Dublin, although they knew or should have known that doing so posed an excessive and irreversible risk to Plaintiff's safety and welfare.

152. Defendants contributed to, and took advantage of, FCI Dublin's culture, turning a blind eye towards sexual harassment, abuse, and assaults of incarcerated people. Defendants knew, and ensured, that there would be no consequences for sexually abusive conduct at FCI Dublin.

153. Defendants deliberately disregarded numerous warning signs, indications, and complaints regarding Defendant Ramos's sexually abusive behavior. They refused to take reasonable measures to provide Plaintiff with a reasonably safe environment, and instead allowed Ramos to roam free in FCI Dublin without any restraints or supervision.

154. Defendants knew or should have known that there was a high degree of risk that prisoners, and Plaintiff in particular, would be sexually assaulted. Nonetheless, Defendants assisted in creating and increasing the danger to Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Defendant Ramos's recurrent sexual abuse. They enabled and acquiesced in Ramos's conduct, thereby placing Plaintiff

directly in harm's way.

155. Moreover, Defendants did not properly penalize, discipline, or train Defendant Ramos to ensure that he would not continue to pose danger to the Plaintiff. Ramos operated with impunity in an environment in which he knew he would not be adequately supervised, trained, or disciplined.

156. Each of the Defendants deprived Plaintiff of her right to be free from cruel and unusual punishment by subjecting her to a substantial risk of serious harm including sexual abuse, by acting in conscious disregard of that known risk.

157. Each of the Defendants affirmatively used his or her authority in a way that created a danger to Plaintiff or that rendered Plaintiff more vulnerable to danger.

158. Each of the Defendants acted with a degree of culpability that shocks the contemporary conscience.

159. Each of the Defendants knew of and disregarded the excessive risk of harm to Plaintiff's health and safety.

160. Each of the Defendants was aware of facts from which the inference could reasonably be drawn that Defendants had an opportunity to intervene and prevent the exacerbation of Plaintiff's injuries and damages, and yet did not do so and instead inflicted unnecessary pain and suffering.

161. Such actions of each Defendant caused to subject the Plaintiff in the custody or under the physical control of the United States government to cruel, inhuman, or degrading treatment or punishment prohibited by the Fifth and Eighth Amendments to the Constitution of the United States and constitute a blatant violation of Plaintiff's civil rights secured by laws of the United States.

162. As a direct and proximate result of the foregoing, Plaintiff S.F.V. suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity,

as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

163.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

164.    Plaintiff also demands the imposition of exemplary and punitive damages as to this Cause of Action, as the Defendants' conduct was malicious, willful, wanton, callous, and reckless.

165.    Defendant Ramos's horrific abuse constitutes willful or malicious violation of Plaintiff's constitutional, statutory, and civil rights, which justifies an award of exemplary and punitive damages.

166.    Defendants' deliberate indifference in their refusal to provide necessary protection to vulnerable prisoners including Plaintiff and/or their direct refusal to intervene once they observed or were notified about Defendant Ramos's sexual abuse constitutes willful or malicious violation of Plaintiff's constitutional, statutory, and civil rights, which justifies an award of exemplary and punitive damages.

167.    The egregious circumstances surrounding the treatment of Plaintiff at relevant times, which caused her to suffer the injuries and damages as set forth above, justify an award of exemplary and punitive damages.

168.    Therefore, in addition to compensatory damages, Plaintiff seeks an award of exemplary and punitive damages, reasonable attorneys' fees, and costs against Defendants as for this Claim.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

## THIRD CLAIM FOR RELIEF

### (Negligence Claim under Federal Tort Claims Act)

### (Against Defendant United States)

169.    Plaintiff hereby repeats, reiterates, and incorporates by reference each of the

foregoing paragraphs with the same force and effect as if fully set forth herein.

170. At all relevant times, Defendant United States, individually or through its agents, servants, contractors, and/or employees undertook and endeavored to, and did provide custodial care to people incarcerated at FCI Dublin including but not limited to the Plaintiff.

171. At all relevant times, Defendant United States hired various correctional and/or administrative personnel at FCI Dublin, including but not limited to wardens, associate wardens, captains, lieutenants, unit managers, counselors, correctional officers, and investigators.

172. These FCI Dublin personnel were all federal employees and were acting within the scope of their employment with the United States when exercising custodial care, control, and supervision to Plaintiff S.F.V.

173. At all relevant times, FCI Dublin personnel including Defendants Ramos and Does 1-10 held themselves out to persons incarcerated at FCI Dublin, and in particular to Plaintiff, as correctional and/or administrative personnel with the knowledge, capacity, and ability to provide due care in accordance with standards of reasonable care common and acceptable in the community.

174. Defendant United States, individually or through its agents, servants, contractors, and/or employees owed a non-delegable duty of care to Plaintiff while they were housed at FCI Dublin.

175. It was the Defendant's duty to ensure that correctional and/or administrative personnel with a history of assaults were not allowed to harm or injure other incarcerated people.

176. It was the Defendant's duty to maintain, operate, and control FCI Dublin as a safe and secure space for persons in it, including but not limited to Plaintiff.

177. It was the Defendant's duty to provide adequate custody, control, supervision, and monitoring to persons at FCI Dublin, including but not limited to Plaintiff.

178. It was the Defendant's duty to adequately protect incarcerated people including Plaintiff from foreseeable harm inflicted by BOP personnel known to be dangerous, including Defendant Ramos.

179. Defendant United States, individually or through its agents, servants, contractors, and/or employees, acting within the scope of their office or employment, breached each of the foregoing duties that they owed to Plaintiff by failing to take adequate steps to protect them from Defendant Ramos promptly, despite the obvious risks presented by Ramos, a known predator in uniform.

180. That breach directly exposed Plaintiff to an unreasonable risk of bodily injury, caused them to fear for their life and safety, and resulted in their being sexually assaulted on repeat occasions by Defendant Ramos.

181. Agents, servants, contractors, and/or employees of the United States knew or should have known that Defendant Ramos was likely to engage in criminal conduct that injured Plaintiff and other people incarcerated at FCI Dublin.

182. Agents, servants, contractors, and/or employees of the United States knew or should have known that Defendant Ramos had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations including his pattern of spending time in off-camera spaces alone with prisoners, the history of staff sexual abuse at FCI Dublin with similar *modus operandi* as that of Ramos, and/or prior reports or allegations made against Ramos.

183. Agents, servants, contractors, and/or employees of the United States knew or should have known that Defendant Ramos was targeting Plaintiff. They observed that Ramos was interacting and meeting with Plaintiff in an unusual manner, such that they knew or should have known to report the behavior, investigate further and/or otherwise intervene to prevent any further sexual abuse, and yet they did not do so.

184. Despite actual and constructive notice of Defendant Ramos's abuse, agents, servants, contractors, and/or employees of the United States failed to take reasonable steps to prevent Plaintiff from being preyed upon by Ramos.

185. Despite actual and constructive notice of Defendant Ramos's abuse, agents, servants, contractors, and/or employees of the United States did not take reasonable, available measures to abate the risk of sexual abuse to Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

186. Despite actual and constructive notice of Defendant Ramos's abuse, agents, servants, contractors, and/or employees of the United States acted negligently in training, retaining, supervising, and/or disciplining Ramos.

187. Despite actual and constructive notice of Defendant Ramos's abuse, agents, servants, contractors, and/or employees of the United States failed to adequately monitor, supervise, investigate, or discipline Ramos.

188. Even though the United States' hiring, retention, and promotion of its employees are sometimes considered discretionary, when, as here, the United States was aware of its employees' tortious conduct, ignored and assisted in it, its retention of those employees does not represent a choice based on legitimate policy considerations.

189. Agents, servants, contractors, and/or employees of the United States did not possess the necessary skill to maintain safe and secure environment and protect Plaintiff from foreseeable harm.

190. Agents, servants, contractors, and/or employees of the United States neglected to apply the skill they did have.

191. Agents, servants, contractors, and/or employees of the United States did not use reasonable care in applying the skill they had.

192. Agents, servants, contractors, and/or employees of the United States mistreated Plaintiff and/or were negligent in other ways that are documented in the relevant records and/or in ways of which Plaintiff are not yet aware.

193. At all relevant times, each of the Defendants stood in such a relationship with the other Defendants as to make each of the Defendants liable for the acts and omissions of all other Defendants in regard to their treatment of Plaintiff.

194. Plaintiff's injuries herein were proximately caused by the carelessness,

recklessness, gross negligence, negligence, and deliberate indifference of Defendant United States and its agents, servants, contractors, and/or employees, who were on duty and acting within the scope of their employment when they engaged in the wrongful conduct described herein.

195. Plaintiff's injuries were inflicted solely through the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of Defendant United States and its agents, servants, contractors, and/or employees, and through no fault or want of care or contributory negligence on the part of Plaintiff.

196. The failure of FCI Dublin personnel to prevent, investigate, or acknowledge Defendant Ramos's sexual abuse served no legitimate policy purpose. On the contrary, FCI Dublin staff were required by mandatory BOP policies and federal regulations to immediately intervene and investigate when they learned of his suspected sexual abuse. Their failure to do so was patently outside of their discretionary function.

197. Plaintiff's injuries were direct and proximate consequences of Defendant United States' (a) failure to enforce zero-tolerance policy against sexually abusive conduct, 28 C.F.R. § 115.11; (b) failure to supervise, monitor, and surveil one-on-one physical contact between BOP personnel and incarcerated persons, 28 C.F.R. § 115.13; (c) decision to hire, retain, and promote BOP personnel who was suspected or alleged to have had improper sexual contact, 28 C.F.R. § 115.17; (d) punishment of victims through disciplinary or retaliatory measures instead of providing proper support and protection, 28 C.F.R. § 115.43; (e) failure to report suspicion or allegation of sexual abuse, 28 C.F.R. § 115.61; (f) failure to protect victims from retaliation after reporting sexual abuse, 28 C.F.R. § 115.67; (g) failure to promptly, thoroughly, and objectively investigate all allegations or reports, 28 C.F.R. § 115.71(a); and (h) failure to discipline staff for sexual misconduct, 28 C.F.R. § 115.76.

198. FCI Dublin personnel's employment at FCI Dublin was essential to their commission of tortious misconduct, which could not have occurred absent their federal employment and related privileges.

199. FCI Dublin personnel's conduct was grossly negligent in that they were so careless as to show complete disregard for the rights and safety of Plaintiff.

200. FCI Dublin personnel were aware of facts that gave rise to an unreasonable risk that Plaintiff would be irreparably injured.

201. It was foreseeable to FCI Dublin personnel, based on the facts known to them, that Plaintiff were at a risk of imminent serious harm including sexual abuse.

202. Yet, FCI Dublin personnel failed and/or refused to prevent the abuse of Plaintiff or to prevent its psychological consequences from worsening to the extent that they did.

203. The above-described acts and omissions of FCI Dublin personnel constitute the tort of negligence under the laws of the State of California.

204. Under the Federal Tort Claims Act, Defendant United States of America is liable for the acts and omissions of its agents, servants, contractors, and/or employees that occurred within the scope of their employment as here.

205. As a direct and proximate result of the foregoing, Plaintiff S.F.V. suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

206. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

**FOURTH CLAIM FOR RELIEF**

**(Negligent Infliction of Emotional Distress Claim under Federal Tort Claims Act)**

**(Against Defendant United States)**

207. Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

208. The above-described acts and omissions of FCI Dublin personnel including Defendants Ramos and Does 1-10 constituted extreme and outrageous conduct.

209. Defendant United States, individually or through its agents, servants, contractors, and/or employees, directly caused, or disregarded a substantial probability of causing, severe emotional distress and mental injury to Plaintiff.

210. Plaintiff in fact suffered debilitating emotional suffering.

211. The above-described acts and omissions of FCI Dublin personnel constitute the tort of negligent infliction of emotional distress under the laws of the State of California.

212. Under the FTCA, Defendant United States of America is liable for the acts and omissions of its agents, servants, contractors, and/or employees that occurred within the scope of their employment as here.

213. As a direct and proximate result of the foregoing, Plaintiff S.F.V. suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

214. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

[4527071.2]

42

[Case No. 4:24-cv-04233]

COMPLAINT
DEMAND FOR JURY TRIAL

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

## FIFTH CLAIM FOR RELIEF

### (Intentional Infliction of Emotional Distress Claim under Federal Tort Claims Act)

### (Against Defendant United States)

215.    Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

216.    The acts and omissions of FCI Dublin personnel including Defendants Ramos and Does 1-10 constituted extreme and outrageous conduct.

217.    Defendant United States, individually or through its agents, servants, contractors, and/or employees, engaged in extreme and outrageous conduct by repeatedly subjecting Plaintiff to sexual acts while they were incarcerated in their custody. They abused their authority and power to violate them in a manner that is shocking, atrocious, despicable, and intolerable beyond all bounds of decency.

218.    Defendant United States, individually or through its agents, servants, contractors, and/or employees, had an intention to cause, or recklessly disregarded the probability of causing, severe emotional distress and mental injury to Plaintiff.

219.    Plaintiff in fact suffered debilitating emotional suffering. Her emotional distress was so substantial and enduring that no reasonable person in a civilized society should be expected to endure it.

220.    The above-described acts and omissions of FCI Dublin personnel constitute the tort of intentional infliction of emotional distress under the laws of the State of California.

221.    Plaintiff's injuries and damages were caused, in whole or in part, by intentional torts (*e.g.*, intentional infliction of emotional distress, gender violence, sexual assault, and battery) perpetrated by Defendants Ramos and Does 1-10. Under 28 U.S.C. §2680(h), Defendant United States is liable for intentional torts perpetrated by its agents, including correctional officers and other law enforcement officers, that occurred within the scope of their employment or under color of federal law as here.

222. At all relevant times, Defendants Ramos and Does 1-10 were acting under color of authority as "law enforcement officers" within the meaning of 28 U.S.C. §2680(h). At all relevant times, Defendants Ramos and Does 1-10 supervised, disciplined, oversaw, monitored, controlled, directed, ordered, restrained, and imprisoned the Plaintiff within the scope and course of their employment with Defendant United States.

223. At all relevant times, Defendants Ramos and Does 1-10 used their authority as law enforcement officers to direct, order, restrain, force, overpower, intimidate, threaten, coerce, blackmail, harass, abuse, and assault the Plaintiff and to prevent her from disclosing the sexual assaults for fear of retaliation, victim-blaming or shaming, additional assaults, among others.

224. At all relevant times, Defendants Ramos and Does 1-10 used their authority as law enforcement officers to sexually assault the Plaintiff, knowing that she had no ability to consent or to withhold consent.

225. As a result of FCI Dublin personnel's use and abuse of their positions of authority as "law enforcement officers" within the course and scope of their employment, Defendant United States is vicariously liable for the intentional torts committed upon the Plaintiff. Therefore, Plaintiff brings this Claim for intentional infliction of emotional distress under the FTCA against the United States, based on the conduct of its officers including Defendants Ramos and Does 1-10.

226. As a direct and proximate result of the foregoing, Plaintiff S.F.V. suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

227. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional,

mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

## SIXTH CLAIM FOR RELIEF

### (Gender Violence Claim under Federal Tort Claims Act)

### (Against Defendant United States)

228.	Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

229.	Plaintiff brings this Claim under the FTCA for gender violence under California Civil Code § 52.4 against the United States, based on the conduct of its officers including Defendants Ramos and Does 1-10.

230.	Under California law, any person subjected to gender violence may bring a civil action for damages against any responsible party.

231.	Gender violence is a form of sex discrimination that includes physical intrusion or invasion of a sexual nature under coercive conditions. § 52.4 (c)(2).

232.	Gender violence is also committed when a defendant commits a criminal act that has an element to it involving the use or threatened use of physical force against the plaintiff. § 52.4 (c)(1). The statute does not require for there to be actual criminal charges, complaints, or convictions.

233.	Here, Defendant Ramos discriminated against Plaintiff based on her sex and/or gender when he repeatedly sexually abused her, physically intruding and invading upon her body under coercive conditions.

234.	Defendant Ramos also committed criminal conduct involving the use and threatened use of physical force against the Plaintiff.

235.	As a direct and proximate result of the foregoing, Plaintiff S.F.V. suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of

enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

236. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

## SEVENTH CLAIM FOR RELIEF

**(Gender Violence Claim under California Civil Code § 52.4)**

**(Against Defendants Estate of Ramos and Does 1-10, in their respective individual capacities)**

237. Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

238. Plaintiff brings this Claim for gender violence under California Civil Code § 52.4 against Defendants Ramos and Does 1-10 in their individual capacities.

239. Defendant Ramos intentionally sexually assaulted Plaintiff and many other people incarcerated at FCI Dublin on numerous occasions. In subjecting Plaintiff to Ramos's violence, Defendants Ramos and Does 1-10 acted with malice, oppression, and callousness, and their conduct constituted a reckless disregard of Plaintiff's rights, which justifies an award of exemplary and punitive damages.

240. Therefore, in addition to compensatory damages, Plaintiff seeks an award of exemplary and punitive damages, reasonable attorneys' fees, and costs against Defendants as for this Claim.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

## EIGHTH CLAIM FOR RELIEF

### (Sexual Assault and Battery Claim under Federal Tort Claims Act)

### (Against Defendant United States)

241.   Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

242.   Plaintiff brings this Claim under the FTCA for sexual assault and battery under California Civil Code § 1708.5 against the United States, based on the conduct of its officers including Defendants Ramos and Does 1-10.

243.   Under California law, sexual battery is defined as intentional harmful or offensive sexual contact with the plaintiff. A victim of sexual battery may bring a civil action for damages against the responsible party.

244.   Here, Defendant Ramos repeatedly subjected Plaintiff to sexual acts, with the intent to cause harmful or offensive contact. Ramos's contact with the Plaintiff was deeply offensive to her personal dignity and would offend a person of ordinary sensitivity.

245.   As a direct and proximate result of the foregoing, Plaintiff S.F.V. suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

246.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

## NINTH CLAIM FOR RELIEF

**(Sexual Assault and Battery Claim under California Civil Code § 1708.5)**

**(Against Defendants Estate of Ramos and Does 1-10, in their respective individual capacities)**

247.   Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

248.   Plaintiff brings this Claim for sexual assault and battery under California Civil Code § 1708.5 against Defendants Ramos and Does 1-10 in their individual capacities.

249.   Defendant Ramos acted with the intent to cause harmful and offensive contact with Plaintiff's intimate body parts, resulting in sexually offensive contact on numerous occasions with Plaintiff as described above.

250.   Defendant Ramos acted with the intent to cause harmful and offensive contact with Plaintiff S.F.V. by forcing her to have sexually offensive contact with his intimate body part as described above.

251.   Defendant Ramos intentionally caused an imminent and reasonable apprehension of sexual assault, and a sexually offensive contact with Plaintiff directly and indirectly resulted on numerous occasions.

252.    In subjecting Plaintiff to Ramos's sexual assault and battery, Defendants Ramos and Does 1-10 acted with malice, oppression, and callousness, and their conduct constituted a reckless disregard of Plaintiff's rights, which justifies an award of exemplary and punitive damages.

253.   Therefore, in addition to compensatory damages, Plaintiff seeks an award of exemplary and punitive damages, and costs against Defendants as for this Claim.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

[4527071.2]

48

[Case No. 4:24-cv-04233]

COMPLAINT
DEMAND FOR JURY TRIAL

## TENTH CLAIM FOR RELIEF

### (Tom Bane Civil Rights Act Claim under Federal Tort Claims Act)

### (Against Defendant United States)

254.	Plaintiff hereby repeats, reiterates, and incorporates by reference each of the foregoing paragraphs with the same force and effect as if fully set forth herein.

255.	Plaintiff brings this Claim under the FTCA for the violations of California Civil Code § 52.1, otherwise known as Tom Bane Civil Rights Act or "the Bane Act," against the United States, based on the conduct of its officers including Defendants Ramos and Does 1-10.

256.	The Bane Act provides remedy when Plaintiff's constitutional rights are interfered with by threat, coercion, or violence.

257.	Defendant United States, through its agents, servants, contractors, and/or employees, violated Plaintiff's rights under the Bane Act by implementing threat, coercion, or violence to interfere with Plaintiff's rights secured by not only federal constitution but California state constitution as well, including but not limited to their right of protection from bodily harm and sexual violation, imposition of punishment without due process, and cruel and unusual punishment. *See, e.g.*, Cal. Const. Art. I §§ 7, 17; Cal. Civ. Code § 43.

258.	Defendants Ramos and Does 1-10 intentionally, deliberately, and repeatedly interfered with Plaintiff's constitutional rights by threats, intimidation, or coercion.

259.	Defendant United States is liable for the Bane Act violations of its agents, servants, contractors, and/or employee. *See Xue Lu v. Powell*, 621 F.3d 944, 950 (9th Cir. 2010).

260.	As a direct and proximate result of the foregoing, Plaintiff S.F.V. suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any

past and future medical expenses and economic injuries.

261.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Plaintiff is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff S.F.V. respectfully requests that judgment be entered against Defendants, and each of them, and that this Court grant the following to the Plaintiff:

1.    An award of compensatory damages for all injuries caused by the Defendants, including psychological and personal injuries, pain and suffering, emotional distress, humiliation, physical injuries, loss of enjoyment of life, loss of quality of life, and mental, financial, economic, and reputational damages, both past and future, general and special, and other harm, in an amount to be determined at trial;

2.    An award of exemplary and punitive damages against Defendants Ramos and Does 1-10 as to the First, Second, Seventh, and Ninth Claims for Relief in an amount to be determined at trial;

3.    An award of pre- and post-judgment interest to the fullest extent permitted by law, for any and all monetary and/or non-monetary losses;

4.    An award of reasonable costs of suit and litigation expenses to the fullest extent permitted by law;

5.    An award of reasonable attorneys' fees to the fullest extent permitted by law, including but not limited to Cal. Civ. Code § 52.4; together with

/ / /

/ / /

/ / /

/ / /

[4527071.2]                                        50                                        [Case No. 4:24-cv-04233]

COMPLAINT
DEMAND FOR JURY TRIAL

6.     Such other and further relief at law or in equity as this Court may deem just and proper.

DATED:  July 15, 2024                    Respectfully submitted,

                                         ROSEN BIEN GALVAN & GRUNFELD LLP


                                         By:  /s/ Kara J. Janssen
                                              Kara J. Janssen

                                         Attorneys for Plaintiff

DATED:  July 15, 2024                    THE JACOB D. FUCHSBERG
                                         LAW FIRM, LLP


                                         By:  /s/ Jaehyun Oh
                                              Jaehyun Oh

                                         Attorneys for Plaintiff